IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Lord Byron Slater, #279992, | ) | Civil Action No.:2:15-cv-01486-JFA-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| L. Cartledge, | ) | |
| | ) | |
| Respondent. | ) | |

The Petitioner, a state prisoner, seeks habeas relief pursuant to 28 U.S.C. § 2254. This matter is before the Court upon Respondent's Motion for Summary Judgment (Dkt. No. 36) as well as two motions filed by Petitioner: Petitioner's "Dispositive Motion" (Dkt. No. 34) and Petitioner's Motion for Summary Judgment (Dkt. No. 39).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

The Petitioner filed the instant action on or about April 3, 2015. (Dkt. No. 1.) On July 9, 2015, Respondent filed a Motion for Summary Judgment. (Dkt. No. 13; *see also* Dkt. No. 12.) On February 1, 2016, the undersigned issued a Report and Recommendation, recommending granting Respondent's Motion for Summary Judgment (Dkt. No. 13) and concluding that the instant § 2254 petition was untimely. (Dkt. No. 24.) Petitioner objected, and on March 17, 2016, the Honorable Sol Blatt Jr. issued an Order declining to adopt that Report and Recommendation. (Dkt. No. 29.) Judge Blatt concluded that Petitioner was entitled to equitable tolling; he therefore remanded the matter to the undersigned for further consideration. (Dkt. No. 29.) In accordance with Judge Blatt's ruling, the undersigned issued the following Text Order on March 17, 2016:

> TEXT ORDER re 29 Order dated March 17, 2016. In light of Judge Blatt's Order remanding this matter to the undersigned for further consideration (Dkt. No. 29), a new deadline for dispositive motions is hereby established, such that dispositive motions are due on or before April 18, 2016. AND IT IS SO ORDERED.

(Dkt. No. 32.)

On or about March 22, 2016, Petitioner filed a motion entitled "Dispositive Motion." (Dkt. No. 34.) On April 6, 2016, Respondent filed a Renewed Motion for Summary Judgment. (Dkt. No. 36.) By order filed April 6, 2016, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the Petitioner was advised of the summary judgment procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 37.) On or about April 11, 2016, Petitioner filed a Motion for Summary Judgment and a Response in Opposition to Respondent's Motion for Summary Judgment. (*See* Dkt. No. 39.)[1]

## PROCEDURAL HISTORY

The Petitioner is currently confined within the South Carolina Department of Corrections ("SCDC") at McCormick Correctional Institution. In May of 2001, the Charleston County Grand Jury indicted Petitioner for murder and possession of a firearm during the commission of a violent crime. (Dkt. No. 12-22.) Petitioner was represented by Ashley Pennington, Esquire, and S. Boyd Young, Esquire. (*See* R. at 1.) Petitioner proceeded to a jury trial before the Honorable Edward B. Cottingham on November 13-15 of 2001. (R. at 1-584.) On November 15, 2011, the jury convicted Petitioner as charged. (R. at 557-58.)[2] Judge Cottingham sentenced Petitioner to life in prison. (R. at 580-81.)

Petitioner appealed and was represented by Robert M. Dudek, Esquire, of the South Carolina Office of Appellate Defense. (*See* R. at 617-36.) On April 28, 2003, Petitioner filed a Final Brief of Appellant, wherein he raised the following issues:

1.

Whether the court erred by refusing to instruct on self-defense where there was evidence of a fight and robbery in a parking lot which appellant was not involved in, evidence that a gun was pointed at appellant when he went near the commotion, and evidence that appellant returned fire after hearing a gunshot while on the run from

---

[1]On April 26, 2016, this case was reassigned to the Honorable Joseph F. Anderson, Jr. (Dkt. No. 41; *see also* Dkt. No. 43.)

[2]The State subsequently *nolle prossed* the weapons charge. (R. at 858, 860.)

the scene, since this constituted evidence of self-defense mandating that instruction?

2.

Whether the court erred by allowing the decedent's mother to testify her son did not have any prior criminal record, since this testimony was not relevant?

3.

Whether the court erred by allowing Officer Hester to testify Deshawn Brown told him that he did not hear anyone else shooting in the parking lot where the victim was hit, since this testimony was inadmissible hearsay?

(R. at 621.)

In a published opinion filed on August 9, 2004, a panel majority of the South Carolina Court of Appeals reversed Petitioner's conviction for murder, concluding that the trial court "erred in failing to charge the jury on self-defense." *State v. Slater (Slater I)*, 360 S.C. 487, 488, 602 S.E.2d 90, 91 (Ct. App. 2004).[3] The State filed a Petition for Rehearing, which was denied on September 23, 2004. (R. at 687-700.) On October 25, 2004, the State filed a Petition for Writ of Certiorari, wherein the State raised the following issue:

Whether the majority of the Court of Appeals erroneously held that Respondent was entitled to a self-defense charge because there was no evidence presented to satisfy the first, third and fourth elements of self-defense or that Respondent communicated an intent to withdraw from the conflict, and the only evidence was that Respondent murdered an unarmed and defenseless victim?

(*See* R. at 637-57.)

In a published opinion filed on April 9, 2007, the Supreme Court of South Carolina reversed the decision of the Court of Appeals, concluding that the "trial court correctly found that Slater was not entitled to a self-defense charge and the court of appeals erred in reversing Slater's conviction on this ground." *State v. Slater (Slater II)*, 373 S.C. 66, 71, 644 S.E.2d 50, 53 (2007). The matter was remitted to the lower court on April 25, 2007. (Dkt. No. 12-11.)

---

[3]As set forth below, the South Carolina Court of Appeals' decision was ultimately reversed. *See State v. Slater*, 373 S.C. 66, 644 S.E.2d 50 (2007).

On May 23, 2007, Petitioner filed an application for post-conviction relief ("PCR"). (R. at 744-57.) Therein, he alleged that he was being held in custody unlawfully due to the ineffective assistance of counsel. (R. at 747.) Specifically, Petitioner alleged counsel was ineffective in the following particulars (verbatim):

> 1.     Trial counsel failed to bring to the attention of the trial judge the defective advice of rights warnings, doing so would've aided the motion to suppress defendants [sic] statement and the fruits of the search warrant under fruit of the poisonous tree doctrine.
>
> 2.     Trial counsel failed to impeach Officer Palmer, who gave conflicting testimony in camera direct examination, doing so would've aided the motion to suppress defendants [sic] statement and the fruits of the search warrant under fruit of the poisonous tree doctrine.
>
> 3.     Trial counsel failed to request instructions on lesser included offenses of involuntary manslaughter and reckless homicide, which were supported by the evidence.
>
> 4.     Trial counsel ineffective for allowing two witnesses to take the stand without first having them disclosed to the jury in advance through voir dire, it was a[n] error on counsels [sic] part, witnesses weren't in defendants [sic] favor, and aided the prosecutor in a conviction of the greater offense.
>
> 5.     Trial counsel ineffective for admitting guilt in opening statement, failing to advance any theory of defense, and attempting to establish only that the defendant killed victim without malice, but presumed prejudice because defendant, who pleads not guilty, is [e]ntitled to a defense.
>
> 6.     Trial counsel failed to object to the prosecutors [sic] closing argument comments, telling the jury the victim was shot twice while on the ground. There was no forensic medical examiner to prove that theory.
>
> 7.     Trial counsel duty at voir dire, is to safe guard defendant from possible bias jurors, failed to do so, when counsel did not note the fact to the trial judge, that the incident took place in a church parking lot, and there might've been potential members of that church on defendants [sic] juror panel.

(R. at 748-48.)

On November 16, 2009, an evidentiary hearing was held before the Honorable Deadra L. Jefferson. (R. at 764-811.) Petitioner was present and represented by William Runyon, Esquire. (*See* R. at 764.) In an order dated December 17, 2009, Judge Jefferson denied the application for

4

post-conviction relief and dismissed the petition. (R. at 814-22.) On March 25, 2011, Mr. Runyon

served a Notice of Intention to Appeal, but the appeal was dismissed as untimely. (*See* Dkt. No. 12-

12.)

On May 10, 2011, Petitioner filed a second application for PCR. (R. at 823-30.) Therein, he

sought a belated appeal, and contended PCR counsel was ineffective, for the following reasons

(verbatim):

> 1. PCR counsel didn't notify applicant of PCR judgment until March 25, 2011 order
> of dismissal was filed December 21, 2009[.]

> 2. Applicant was denied the opportunity to file a 59(e) to amend order to include
> things that wasn't addressed in [the] order, due to the late notice of first PCR ruling
> by PCR counsel's own negligence[.]

> 3. PCR counsel failed to file appeal in a timely manner, counsel filed appeal March
> 25, 2011, which the courts ruled untimely[.]

(R. at 823-30.) Petitioner, through Attorney Charles T. Brooks, III, filed a Motion to Amend his

application on September 30, 2011. (R. at 831-32.) Therein, Petitioner sought to amend his

application to raise the following issues (verbatim):

> I) PCR Counsel was ineffective for failing to raise every available issue as required
> By Rule 71.1(d) S.C.R. CIV. P and failed to file a 59(e) to address the issues.

>> A) PCR Counsel failed to raise the issue that the implied malice
>> charge impermissibly shifted the burden of proof and created a
>> mandatory presumption in violation of due process, Sandstorm v
>> Montana 99 S.C.T. 2450, 442 U.S. 510, 524, (1979). Holding that
>> "burden shifting presumptions or conclusive presumptions" deprive
>> a defendant of the due process of law and are therefore
>> unconstitutional. See Mullaney v. Wilber, 95 S.Ct. 1881 (1975), a also
>> see State v Jenkins, 443 S.E.2d 244, 252 (1994). The only evidence of
>> malice was the use and possession of handgun.

>> B) PCR Counsel failed to raise the issue of failure of trial counsel to
>> adequately cross-examine the states expert witness on the issue of
>> whether or not the victim was beaten or assaulted.

>> C) Ineffective assistance of appellate counsel did not raise issue that
>> State failed to prove "Malice aforethought beyond a reasonable doubt.

D) PCR Counsel failed to file a 59(e) to argue that the defendant did not shoot victim in self-defense. The defendant shot in self-defense of the aggressors and the victim was shot accidentally which made the killing involuntary manslaughter which would have shown evidence to charge the jury accidental death, because the jury would not be charged the implied malice instruction base on the use of a deadly weapon.

E) Trial counsel was ineffective for failing to argue accident, State v Burris, 513 S.E.2d 104 (SC 1999), involuntary manslaughter.

(R. at 831-32.)

On July 24, 2012, the Honorable Stephanie P. McDonald held a hearing on Petitioner's second application for PCR. (R. at 839-50.) In a Consent Order filed on August 21, 2012, Judge McDonald granted Petitioner a belated appeal of the denial of his first PCR application pursuant to *Austin v. State*;[4] she ruled that "[a]ll other allegations are waived and dismissed with prejudice." (R. at 851-55.)

On August 5, 2013, Petitioner, thorough Attorney David Alexander of the South Carolina Commission on Indigent Defense, filed a Petition for Writ of Certiorari Pursuant to *Austin v. State*. (Dkt. No. 12-17.) Therein, Petitioner raised the following issue:

Whether trial counsel provided ineffective assistance in derogation of Petitioner's Fifth and Sixth Amendment rights by failing to move to suppress (1) petitioner's statements, and (2) evidence flowing from petitioner's statements because petitioner's statements were given after inadequate warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966)?

(Dkt. No. 12-17 at 3 of 13.)

On August 21, 2014, the South Carolina Supreme Court filed an Order in which it (1) granted the petition for a writ of certiorari from Judge McDonald's order, (2) dispensed with further briefing, (3) performed an *Austin* review of Judge Jefferson's Order of Dismissal and, (4) after that review, denied certiorari from Judge Jefferson's Order. (Dkt. No. 12-20.) The matter was remitted to the lower court on September 8, 2014. (Dkt. No. 12-21.)

---

[4]*See Austin v. State*, 305 S.C. 453, 409 S.E.2d 395 (1991).

Petitioner then filed the instant habeas petition, wherein he raised the following grounds for review (verbatim):

**GROUND ONE**: Trial courts erred by not allowing the jury to deliberate self-defense. In violation of the 5th and 14th Amendments.
**Supporting facts**: Someone shot at defendant first, and defendant return fire to keep from being shot, because the aggressor's shot came real close to hitting defendant. By defendant testifying at trial it made it a jury issue. Witness at trial also testified that it was 3 to 4 different people shooting that night.

**GROUND TWO**: Trial counsel failed to object to the 1st set of Miranda Warnings that failed to let defendant know he could end the interrogation in violation of the 4th, 5th, 6th and 14 Amendments.
**Supporting facts**: Defendant was arrested 2/4/01 at 5:00 a.m. without an arrest warrant no probable cause when prior to arrest defendant as well as the occupant of car were pulled over question then released. At police station defendant during interrogation stated he had a gun for his own protection, this statement was used to get a search warrant 2 hrs later, not one time did the detective inform defendant that he could put an end to the interrogation. Defendant was arrested at his house.

**GROUND THREE**: 1) Newly discovered evidence - Brady violation. 2) Subject matter jurisdiction. 3) Failure to investigate. 4) Newly after discovered evidence. 5) Police Misconduct. 6) Conflict of interest.
**Supporting facts**: 1) Victim tested positive for cannabinoids cross re-actives bag of marijuana was found on scene victim had a breathing ailment, gunshot wounds weren't fatal. 2) NCPD didn't have probable cause to arrest defendant due to a prior stop and release[.] 3) Marijuana found in victims [sic] system tied victim to bag of marijuana found in parking lot. Autopsy report was evidence that victim had 2 different sized entry wounds one big, one small, also yellow metal jacket projectile retrieve from body contradicts ballistics report done by SLED that projectile in body was nickel plated. 4) Victim was shot with 2 different caliber guns. 5) NCPD switch out and planted projectiles. 6) Trial counsel was baseball coach of victim and close friends with victim's mother.

(Dkt. No. 1 at 6-9 of 15.)

## **APPLICABLE LAW**

### **Summary Judgment Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when

they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

**Habeas Standard of Review**

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## DISCUSSION

As noted above, several motions are pending in the case *sub judice*: Respondent's Motion for Summary Judgment (Dkt. No. 36),[5] Petitioner's "Dispositive Motion" (Dkt. No. 34), and Petitioner's Motion for Summary Judgment (Dkt. No. 39). Before turning to the merits of the individual grounds for relief, the undersigned will briefly review the facts of this case.

On the evening of February 3, 2001, twenty year old Sharone Middleton, the victim, drove his cousins, Demetrius and Mark Nelson, to a step show at North Charleston High School. (R. at 121-23.) Demetrius testified that Mark went into the show while the victim and Demetrius drove around Rivers Avenue. (R. at 122-24.) Demetrius further testified that he and the victim then parked in a church parking lot across from the school, waiting for Mark. (R. at 124-25.) According to Demetrius, around 10:00PM, Mark saw them and began walking towards the car. (R. at 125-26.) Demetrius testified as follows:

> When he find the car, we saw Mark like start walking at first and then he started to run, because some guys was following him. Maybe about six to eight guys following him.
>
> Then when he came to the car he was like running and then he jumped in the car and he tell Sharone, you know, just drive off. Go.
>
> And he was holding his door and he told us to lock the door, because some guys was trying to come in and we didn't even know them.
>
> And before Sharone got a chance to–before Sharone got a chance to leave, the guy was opening the door, and then they started asking Mark for his money.
>
> And then Mark told them that he didn't have any money and then they started hitting him and stuff like that, several times, whatever.
>
> And then Mark–until Mark finally give him his money.
>
> Then they open my door and they asked me for my money. And one dude had like a little handgun or whatever. He came to the side and tell me, Give me my money. And I told him I didn't have any.
>
> And then he had hit me like two times in my side.
>
> And then they pull my cousin Sharone out of the driver's side of the car and they started like kicking him and stomping on him or whatever.

(R. at 126-27.)

---

[5]Respondent continues to assert that Petitioner's habeas petition is barred by the statute of limitations. (*See* Dkt. No. 36 at 2-4 of 20.) Given Judge Blatt's previous ruling in this case, the undersigned does not further address the statute of limitations in the instant Report and Recommendation. (*See* Dkt. No. 29.)

Demetrius testified that he did not recognize any of the individuals who tried to rob them. (R. at 127.) According to Demetrius, some of the individuals were able to get Sharone out of the vehicle; three or four of them were "boxing and kicking him" while he was on the ground, while Sharone was "balling up," trying to "cover[] up . . . his body." (R. at 128-29.) When asked what happened while Sharone "was on the ground trying to protect himself," Demetrius stated, "Well, when I looked over, I saw like somebody shot him or whatever." (R. at 129.) He testified that he initially heard two shots, and then the "guys . . . ran off." (R. at 129-30.) He stated, "[A]s they were running off, they were still shooting at the car or whatever and they jumped off in some car." (R. at 130.) He indicated that six or seven shots were fired as the individuals were running off. (R. at 130.) The vehicle in which they were riding was struck, but neither Demetrius nor his brother were struck. (R. at 130.) Demetrius testified that neither he nor Sharone had a gun that evening; he testified that he did not own a gun and that, to his knowledge, neither did Sharone. (R. at 132-33.)

Terell Bryant testified that on February 3, 2011, he had been at the North Charleston High School dance step show. (R. at 175.) He said that he saw Petitioner there and saw him in the bus parking lot after the show. (R. at 175-76.) Bryant testified that when he walked out, "there was some commotion inside the bus parking lot," and he saw Petitioner "walking towards [him] with a gun in his hand." (R. at 176.) According to Bryant, Petitioner was "walking with [the gun] freely." (R. at 176.) Bryant indicated that after he saw Petitioner, Petitioner got into a white "[t]wo-door long car with red streaks on it." (R. at 176.) Bryant testified that he saw the vehicle Petitioner got into head over to the church parking lot. (R. at 176-77.) Bryant testified that even though he did not see Petitioner get out of the vehicle, he saw the passenger door (the same door he saw Petitioner get into) open and then heard gunshots. (R. at 177-78.) He heard more shots as the vehicle was pulling off. (R. at 182.)

Deshawn Brown testified that on the night of the step show, although he did not arrive with Petitioner, he left with him because Petitioner said he would give Brown a ride home. (R. at 189-91.) He testified he was in the car with Petitioner and "two other fellows." (R. at 191.) Before they left

the vicinity, the group drove over to the church parking lot, where there was a "commotion" taking place. (R. at 191.) According to Brown, Petitioner got out of the car and walked into the crowd. (R. at 192.) Brown testified that he heard gunshots and that at the time he heard the gunshots, Petitioner was in the crowd. (R. at 192.) Brown testified that after the shots, Petitioner ran back to the car; although Brown had not seen Petitioner with a gun up to that point, Brown saw Petitioner with a gun–that Brown described as a "black nine"–when they were driving off. (R. at 192-93, 195.) When asked what Petitioner did with the gun, Brown stated, "Shoot in the air." (R. at 193.) According to Brown, while they were driving off, Petitioner stated "[h]e think dog get hit," meaning that someone was shot. (R. at 196-97.) Brown further testified that after they left the scene, they went to Petitioner's house; Petitioner went inside the house with the gun. (R. at 193-94.) About three to five minutes later, Petitioner came back outside; he did not have the gun at that time. (R. at 194.) The group then drove back to the school; they were stopped by a police officer on the way. (R. at 194-95.) There was no gun in the car at that point. (R. at 195.)

Kenyon Nichols testified that he went to the step show and was planning to ride home with Petitioner and Ellis Judon afterwards. (R. at 212.) He testified that after the show, Ellis Judon was driving, and Petitioner was in the passenger seat. (R. at 213.) According to Nichols, they went into a "little yard by a church," and Petitioner got out and headed towards the crowd. (R. at 213-14.) Shortly after Nichols got out of the car, he heard gunshots and ran back towards the car. (R. at 214-15.) Nichols testified that once everyone was back inside the car, Petitioner started "shooting at the crowd" with a black gun he believed was a nine millimeter. (R. at 215-16.) Nichols further testified as follows:

Q. And where was [Petitioner] shooting at?

A. Inside of the crowd.

Q. Back towards the crowd that y'all were pulling away from?

A. Yes, ma'am.

Q. Did you hear him say anything?

11

A. Yeah, I think I shot him.

Q. And he continued to shoot out the car door–or the window?

A. Yes, ma'am.

(R. at 216.) Nichols indicated that after leaving the scene, they went to Petitioner's house; Petitioner was there briefly–he "came in and came back out." (R. at 216-17.) Nichols testified they went back to the school; they were stopped by police but the police did not find anything in the car. (R. at 217.)

Detective Chris Widmer of the North Charleston Police Department testified that he spoke to Petitioner after he was arrested. (R. 318-27.) According to Widmer, Petitioner told him that "he had heard the shooting and that he ran to the area to see what happened. But he also said that he didn't shoot anybody." (R. at 327.) Widmer testified that a 9mm pistol was found in Petitioner's home when it was searched pursuant to a search warrant. (R. at 324-26.)

Sergeant Doug Hester of the North Charleston Police Department testified that he spoke to Petitioner after reading Petitioner his *Miranda* rights. (R. at 335, 342-52.) Hester testified that Petitioner gave the following statement to Hester:

> Me and my friends went to the step show at North Charleston High School. We got there around seven o'clock p.m. It was me, Ellis Backmon, Shawn and Keon. Shawn was already there, and me, Ellis and Keon drove up together.
>
> After the step show we went into the parking lot. The show had been over for a few minutes. As we were trying to leave, someone had us blocked in in the front and the back.
>
> We saw people running towards the church parking lot. Then we heard gunshots. Then the people who had us blocked in drove away so we followed them on to the road. It was a white Buick.
>
> Then we got stopped by a black female police officer. She let us know the scoop and that police was looking for a white car.
>
> I was driving a white Monte Carlo. She searched us and our car. Then she let us go.
>
> Then we went across the street and to a phone booth and we dropped Shawn off. Some dude in a white Buick picked him up.
>
> Then we were headed up Montague and got stopped again in Liberty Hill. This officer said the police was looking for a white car too. We told him that we just got searched, so he let us go.
>
> Then we went to Sonic's and got something to eat. After that I dropped Keon off and I dropped Ellis off and then I went on home. That's it.

(R. at 350-51.)

Petitioner took the stand in his own defense. (R. at 433-76.) Petitioner testified that as he was standing around outside the high school after the show was over, he saw three or four fellows run to a truck. (R. at 435-36.) When asked how he reacted to that, Petitioner indicated that he "wasn't too much worried about that," but he did decide to "walk back to [his] car and . . . grab the gun [he] had." (R. at 436.) Petitioner testified that he was walking towards the area and had planned to shoot in the air, but he changed his mind and headed back to his car. (R. at 436-39.) Petitioner testified he then noticed "something was going on in the parking lot," so he started walking towards the parking lot. (R. at 439.) According to Petitioner, there were three separate fights going on in the parking lot. (R. at 441.) He further testified as follows:

> Q. All right. Tell us what happened as you approached.
>
> A. When I walked up a man–the man who wasn't the other dude, because one–the man–one dude had–was grabbing one dude, another dude was walking up.
>        And when I walked up on him, I guess I surprised him and he turned to me and he had a gun in his hand. And I see his gun and I started running. And I heard a gunshot. And I start shooting my gun.
>
> Q. How many times did you shoot your gun?
>
> A. I'm not too sure how many times I shot it, but I shot it though.

(R. at 442.) Petitioner was not sure where the other man's gun was pointed because he did not look back. (R. at 444.) He stated that once he got back into the car, he heard more gunshots. (R. at 445.) Petitioner stated, "So riding off, I duck down and I took the gun out and start shooting in the air." (R. at 445.) When he got back into the car, Petitioner told his friends, "I think them boys get somebody." (R. at 446.) On cross-examination, Petitioner stated that he had loaded and cocked the gun earlier in the day, and that when he went to the church parking lot, it was cocked and loaded and ready to be used. (R. at 452-54, 463.)

As noted above, on November 15, 2011, the jury convicted Petitioner of murder. (R. at 557-58.) Having reviewed the factual background of the case, the undersigned now turns to Petitioner's

individual grounds for relief. For the reasons set forth herein, the undersigned recommends denying Petitioner's "Dispositive Motion" (Dkt. No. 34) and Petitioner's Motion for Summary Judgment (Dkt. No. 39); the undersigned recommends granting Respondent's Motion for Summary Judgment (Dkt. No. 36.)

## A.    Ground One

Petitioner asserts in Ground One that the trial court "erred by not allowing the jury to deliberate self-defense," in violation of his rights under the Fifth and Fourteenth Amendments. (Dkt. No. 1 at 6 of 15.) Petitioner states (verbatim),

> Someone shot at defendant first, and defendant return fire to keep from being shot, because the aggressor's shot came real close to hitting defendant. By defendant testifying at trial it made it a jury issue. Witness at trial also testified that it was 3 to 4 different people shooting that night.

(*Id.*)

Respondent contends that, of all the grounds raised in the instant § 2254 petition, only Ground Two is exhausted, as that is the "only issue presented to the state supreme court in the Petition for Writ of Certiorari following the denial of Post-Conviction Relief." (Dkt. No. 12 at 29 of 49.) Respondent notes that Petitioner challenged–at trial and on direct appeal–the trial judge's failure to instruct the jury on self-defense but asserts the "arguments made and the rulings of the state courts . . . addressed only whether the charge was required as a matter of state law," as Petitioner "did not frame the failure to charge as a constitutional issue in state court." (*Id.* at 29-30.)

The undersigned has reviewed the relevant portions of the trial transcript, and Petitioner did not raise any constitutional arguments to the trial judge with respect to his request for a self-defense charge. (*See* R. at 478-84.) Nor did Petitioner–in his Final Brief of Appellant–raise any constitutional arguments with respect to his assertion that the trial court erred in failing to instruct the jury on self-defense. (*See* R. at 617-36.) In addressing Petitioner's claim that the trial court erred in failing to charge self-defense, the South Carolina Supreme Court stated, *inter alia,*

> A self-defense charge is not required unless it is supported by the evidence. *State v. Goodson*, 312 S.C. 278, 280, 440 S.E.2d 370, 372 (1994). To establish

> self-defense in South Carolina, four elements must be present: (1) the defendant must be without fault in bringing on the difficulty; (2) the defendant must have been in actual imminent danger of losing his life or sustaining serious bodily injury, or he must have actually believed he was in imminent danger of losing his life or sustaining serious bodily injury; (3) if his defense is based upon his belief of imminent danger, defendant must show that a reasonably prudent person of ordinary firmness and courage would have entertained the belief that he was actually in imminent danger and that the circumstances were such as would warrant a person of ordinary prudence, firmness, and courage to strike the fatal blow in order to save himself from serious bodily harm or the loss of his life; and (4) the defendant had no other probable means of avoiding the danger. *State v. Bryant*, 336 S.C. 340, 344-45, 520 S.E.2d 319, 321-22 (1999). "If there is any evidence in the record from which it could reasonably be inferred that the defendant acted in self-defense, the defendant is entitled to instructions on the defense, and the trial judge's refusal to do so is reversible error." *State v. Muller*, 282 S.C. 10, 10, 316 S.E.2d 409, 409 (1984).

*Slater II*, 373 S.C. 66, 69-70, 644 S.E.2d 50, 52 (2007).

The South Carolina Supreme Court concluded that Petitioner "fails to meet the first requirement for the self-defense charge: specifically, Slater was not without fault in bringing on the difficulty." *Id*. at 70, 644 S.E.2d at 52. The court stated,

> "Any act of the accused in violation of law and reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars the right to assert self-defense." *Bryant*, 336 S.C. at 345, 520 S.E.2d at 322. In the instant case, the record clearly reflects that Slater approached an altercation that was already underway with a loaded weapon by his side. Such activity could be reasonably calculated to bring the difficulty that arose in this case.

*Slater II*, 373 S.C. at 70, 644 S.E.2d at 52. The court noted that "the uncontradicted evidence illustrates that Slater acted in violation of the law by carrying a weapon." *Id*. at 70, 644 S.E.2d at 52. The court continued,

> Here, Slater's unlawful possession of the weapon was the proximate cause of the homicide. Slater was not merely in unlawful possession of a weapon; he carried the cocked weapon, in open view, into an already violent attack in which he had no prior involvement. Slater's actions, including the unlawful possession of the weapon, proximately caused the exchange of gunfire, and ultimately the death of the victim. Consequently, Slater fails to meet the requirement that he be without fault in bringing on the difficulty and may not avail himself of a charge on self-defense.

*Slater II*, 373 S.C. at 71, 644 S.E.2d at 53.

To the extent Petitioner claims the trial court's failure to charge the jury on self-defense violates the law of the state of South Carolina, such a claim is not cognizable herein. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law." (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))); *see also* 28 U.S.C. § 2254(a); *Smith v. Moore*, 137 F.3d 808, 821-22 (4th Cir. 1998) (refusing to entertain the habeas petitioner's contention that a jury instruction misstated South Carolina law). To the extent Petitioner claims the trial court's failure to charge the jury on self-defense violates his rights pursuant to the Fifth and Fourteenth Amendments, such a claim is defaulted, as such a claim was not raised to, or ruled upon, by any state court. *See Matthews v. Evatt*, 105 F.3d 907, 911-17 (4th Cir. 1997), *abrogated on other grounds by Miller-El v. Dretke*, 545 U.S. 231 (2005); *see also Joseph v. Angelone*, 184 F.3d 320, 328 (4th Cir. 1999) ("In order to avoid procedural default, the 'substance' of [the petitioner's] claim must have been 'fairly presented' in state court." (quoting *Townes v. Murray*, 68 F.3d 840, 846 (4th Cir. 1995))); *Kornahrens v. Evatt*, 66 F.3d 1350, 1361-62 (4th Cir. 1995); *Thomas v. Gibson*, 218 F.3d 1213, 1220-21 (10th Cir. 2000) (concluding petitioner defaulted on claim that counsel was ineffective for "failing to develop evidence that Kenneth Powell was the likely murderer or in failing to present that evidence to the jury at trial" where the petitioner failed "to adequately present the basis of this claim" in the state courts, even though the petitioner asserted "a generalized claim that his trial counsel had not adequately prepared for trial"); *see also S.C. Dep't of Transp. v. M&T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 658, 667 S.E.2d 7, 14-15 (Ct. App. 2008) ("It is well settled that an issue must have been raised to and ruled upon by the trial court to be preserved for appellate review. Additionally, if the losing party has raised an issue in the lower court, but the court fails to rule upon it, the party must file a motion to alter or amend the judgment in order to preserve the issue for appellate review." (citations and internal quotation marks omitted)).

Procedural default may be excused if the Petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501

U.S. 722, 750 (1991); *see also Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012). In the alternative for

showing cause and prejudice, a petitioner may attempt to demonstrate a miscarriage of justice, e.g.,

actual innocence, *Bousley v. United States*, 523 U.S. 614, 623 (1998); *see also Schlup v. Delo*, 513

U.S. 298, 327 (1995), or abandonment by counsel. *Maples v. Thomas*, 132 S. Ct. 912, 924 (2012)

(inquiring "whether [the petitioner] ha[d] shown that his attorneys of record abandoned him, thereby

supplying the extraordinary circumstances beyond his control, necessary to lift the state procedural

bar to his federal petition" (internal quotation marks and citations omitted)).

Petitioner contends that "[d]ue to newly after discovered evidence that Petitioner wasn't the

shooter changes everything." (Dkt. No. 34 at 2 of 4.) Petitioner asserts that the SLED ballistics report

indicates "that a bullet recovered from body of victim during autopsy was a silver tip nickel plated

9 mm hollow point bullet that was tested and confirm[ed] to have been fired by a 9mm handgun that

was found at petitioner's house by search warrant." (Dkt. No. 34 at 1 of 4.) Petitioner states,

> Kim A. Collins did an autopsy of the victim on 2/4/01 and removed a severely
> deformed yellow metal jacketed bullet that was measured at 0.50 inches in length
> with a base measurement of 0.30 x 0.30 inch that is consistent with bullet (A) being
> a .22 caliber bullet, a bullet that was too small to be a 9mm bullet. See Dkt. No. 21-1
> pg 12, 13. The jurors never heard about the yellow metal jacketed .22 caliber bullet
> that was evidence that the SLED ballistics report was a hoax, due to trial counsel
> going into an agreement with the State, that if Kim A. Collins were to testif[y] it
> would be that victim died from 2 indeterminate range penetrating and perforating
> gunshot wounds to the chest. See Dkt. No. 21-1 pg 6, 8. The 2 prong Strickland test,
> 1) trial counsel was in error for going into an agreement to keep the Forensic
> Pathologist from testifying to the type, color, and size of the only bullet recovered
> from the victim during autopsy. 2) It prejudice petitioner because it allowed an
> innocent man to be convicted of shooting victim twice in the chest with a 9mm loaded
> with silver tip nickel plated 9mm hollow point bullets, when the only bullet removed
> from the body was a .22 caliber bullet, that was yellow in color not silver or nickel
> plated, that wasn't a hollow point bullet because the description of the bullet that
> lacked the characteristics of a hollow point bullet which would be mushroom with
> however many petals were left on the bullet. No jury would have convicted petitioner
> for the death of victim being shot in the chest twice with a 9mm loaded with silver tip
> nickel plated 9mm hollow point bullets, when the only bullet recovered from body
> during autopsy was a yellow metal jacketed .22 caliber bullet.

(Dkt. No. 34 at 1-2; *see also* Dkt. No. 21 at 2-4 of 10.)

The undersigned interprets this claim as an actual innocence claim. (*See also* Dkt. No. 39 at 1-2 of 5.) To meet the "threshold requirement" for actual innocence, Petitioner must "persuade[] the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 329 (1995). "To be credible," a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id*. at 324. The *Schlup* standard is a "demanding" one:

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

*House v. Bell*, 547 U.S. 518, 538 (2006) (citing *Schlup,* 513 U.S. 298).

Citing to Ms. Collins' autopsy report, Petitioner argues that the bullet recovered from the victim's body was a .22 caliber bullet and he, therefore, did not kill the victim. As a preliminary matter, it is not entirely certain that this autopsy report is considered "new" evidence, as it was certainly in existence at the time of Petitioner's trial.[6] (*See* Dkt. No. 21-1 at 12-13 of 34; *see also* R. at 298-99.) Regardless of whether this evidence qualifies as "new" evidence, the undersigned recommends concluding that Ms. Collins' autopsy report does not meet the "demanding" *Schlup* standard, Petitioner has not demonstrated that "more likely than not, . . . no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538 (citing *Schlup,* 513 U.S. 298).

The portion of Ms. Collins' autopsy report to which Petitioner points is in the "THORAX AND ABDOMEN" portion of the report; Petitioner points to the following passage:

---

[6]The undersigned notes that "[t]he circuit courts are split on whether 'new' includes only 'newly discovered' evidence–evidence that was not *available* at the time of trial–or more broadly encompasses 'newly presented' evidence–all evidence that was not *presented to the jury* during trial." *Lopez v. Miller*, 915 F. Supp. 2d 373, 400 n.16 (E.D.N.Y. 2013) (citing cases); *see also Dick v. Muse*, Civ. A. No. 3:10CV505, 2014 WL 4854689, at *2 & n.3 (E.D. Va. Sept. 29, 2014).

> A severely deformed yellow metal jacketed bullet designated "l" is recovered in the 10th right posterior lateral intercostal space. The bullet designated "l" measures 0.50 inch in length with a base measurement of 0.30 x 0.30 inch. A "l" is inscribed into the base.

(Dkt. No. 21-1 at 12-13 of 34; *see also* Dkt. No. 21 at 2-3 of 10.) In the opinion of the undersigned, this report does not constitute evidence sufficient to indicate that "more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. at 538.

There is little more than Petitioner's say-so that the bullet recovered from the victim's body was a .22 caliber bullet. Officer Stanley testified at trial that State's Exhibit 27 was several projectiles she collected: one was a projectile that was removed from the victim's body during the autopsy; the second projectile was recovered by public safety from the victim's clothing; the third was a fragment from the door of the victim's vehicle; and the fourth was a projectile located at the scene. (R. at 279-80.) She also testified that State's Exhibit 33 was a 9mm handgun recovered from Petitioner's residence, that State's Exhibit 28 was shell casings recovered from Petitioner's residence, and that State's Exhibit 29 was nine fired 9mm shell casings recovered from the crime scene. (R. at 282-85.) Kenneth Whitler, employed by SLED in the firearms department of the laboratory and qualified as an expert, testified that in his expert opinion, State's Exhibit 33 (a 9mm handgun recovered from Petitioner's residence) fired the three fired projectiles in State's Exhibit 27. (R. at 368, 375.) Whitler also testified that State's Exhibit 33 fired the shell casings in State's Exhibits 28 and Exhibit 29. (R. at 375.)

In addition to the testimony of Officer Stanley and Mr. Whitler, Petitioner himself testified as follows:

> Q. Well, it's perfectly clear now that the evidence shows that it was your handgun that shot Sharone twice in the chest. How do you feel about that?
>
> A. When I realize that's the gun that I had did it, it hurt me.

(R. at 449-50.) Petitioner admitted that the bullets from his gun hit and killed the victim. (R. at 466-67.) On cross-examination, Petitioner further testified:

19

Q. And there is no doubt in your mind, Mr. Slater, that your gun fired the bullets that killed that young boy?

A. I received–I got the bullet results back and it clarified that.

Q. And that's what happened; didn't it? You shot him; didn't you?

A. Yes, sir.

Q. You killed him; didn't you?

A. Yes, sir.

Q. You murdered him; didn't you?

A. Yes, sir.

(R. at 473.) In light of the foregoing, Ms. Collins' report–which in no way identifies the caliber of the bullet recovered from the victim–does not convince the undersigned that, more likely than not, "no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt." *House*, 547 U.S. at 538.[7] Accordingly, the undersigned recommends concluding the procedural bar applies and granting Respondent's Motion for Summary Judgment as to Ground One.

## **B.**     **Ground Two**

In Ground Two, Petitioner contends that trial counsel was ineffective in failing "to object to the 1st set of Miranda Warnings that failed to let defendant know he could end the interrogation." (Dkt. No. 1 at 7 of 15.) Petitioner states (verbatim),

> Defendant was arrested 2/4/01 at 5:00 a.m. without an arrest warrant no probable cause when prior to arrest defendant as well as the occupant of car were pulled over question then released. At police station defendant during interrogation stated he had a gun for his own protection, this statement was used to get a search warrant 2 hrs later, not one time did the detective inform defendant that he could put an end to the interrogation. Defendant was arrested at his house.

(Dkt. No. 1 at 7-8 of 15.)

---

[7]Counsel also testified at the PCR hearing that he hired an expert to confirm the results of the ballistics test and that it "was clear that the weapon taken from [Petitioner's] house was the weapon that discharged the projectile that struck the victim." (R. at 782.) The PCR court found counsel's testimony to be credible. (R. at 819.)

The PCR court addressed this claim of ineffective assistance of counsel. (*See* R. at 815-22.)

The PCR court noted the testimony at the PCR hearing as follows:

> The Applicant testified that counsel admitted Applicant's guilt during his opening statement. He argued that Detective Widmer omitted one of the <u>Miranda</u> warnings, specifically the warning that Applicant had a right to stop the questioning at any time.
> . . .
> Trial counsel testified that he requested a <u>Jackson v. Denno</u> hearing on Applicant's written and oral statements, but he did not argue the issue that Detective Widmer omitted one of the warnings. Counsel testified that Sergeant Hester informed Applicant of his right to stop the questioning at any time before Applicant gave his written statement. Counsel asserted that Applicant did not ask Sergeant Hester to stop the questioning after he was given his <u>Miranda</u> warnings.

(R. at 817.) The PCR court found counsel was not ineffective in failing to object to the first set of

<u>Miranda</u> warnings. The court stated, *inter alia*,

> Regarding the Applicant's claims of ineffective assistance of counsel, this Court finds the Applicant has failed to meet his burden of proof. This Court finds that Applicant's attorney demonstrated the normal degree of skill, knowledge, professional judgment, and representation that are expected of an attorney who practices criminal law in South Carolina. . . . This Court finds that counsel's representation did not fall below an objective standard of reasonableness.
> This Court finds the Applicant received the complete <u>Miranda</u> warnings prior to . . . being interrogated and prior to giving his written statement. (Tr. p. 322, 342-46.) <u>Miranda v. Arizona</u> does not require that an officer, when informing a person of his rights, specifically inform a person that he has the right to stop the questioning at any time. <u>State v. Cannon</u>, 260 S.C. 537, 197 S.E.2d 678 (1973); <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602 (1966). Further, even if the first set of Miranda warnings had been incomplete in some way, this Court finds that the Applicant was not prejudiced by counsel's failure to object to the first set of <u>Miranda</u> warnings, because Applicant did not ask the officers to stop questioning him even after receiving the second warning. This Court finds that the Applicant failed to show that counsel was deficient or that the Applicant was prejudiced in any way related to the <u>Miranda</u> warnings.
> . . .
> Accordingly, in respect to all of Applicant's allegations, this Court finds Applicant has failed to prove the first prong of the <u>Strickland</u> test, specifically that counsel failed to render reasonably effective assistance under prevailing professional norms. This Court also finds the Applicant has failed to prove the second prong of <u>Strickland</u>, specifically that he was prejudiced by . . . counsel's performance. Applicant's complaints regarding counsel's performance are without merit and are denied and dismissed.

(R. at 819-21.)

The undersigned recommends granting summary judgment to Respondent as to Ground Two. The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985). In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." *Id.* While *Strickland* itself is a deferential standard, when both § 2254(d) and *Strickland* apply, "review is doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, when § 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

As noted by the PCR judge, trial counsel requested a *Jackson v. Denno* hearing at the beginning of trial.[8] (*See* R. at 50, 59-100.) Detective Widmer of the North Charleston Police Department testified that when Petitioner was arrested, Widmer advised Petitioner of his constitutional rights; he testified that he read the rights to Petitioner off a yellow card he keeps in his police badge wallet. (R. at 65.) Widmer stated,

---

[8]378 U.S. 368 (1964).

Okay. It's a card. And it says, before we ask you any questions you must understand you have the right to remain silent, anything you say can be used against you in Court.

You have the right to talk to a lawyer for advice before we ask you questions and have a lawyer present while you're being requested [sic].

If you cannot afford a lawyer, one will be appointed for you before any questions–before any questioning, if you wish. And do you understand?

(R. at 66.) Widmer testified that Petitioner indicated he understood his rights. (R. at 66.)

Sergeant Hester of the North Charleston Police Department testified that he interviewed Petitioner around 6 o'clock in the morning of February 4. (R. at 74-75.) Hester testified that he used a written *Miranda* warning sheet when reading the *Miranda* warnings to Petitioner; he testified that he signed the form as well as Petitioner, and that Petitioner initialed beside each warning. (R. at 75-77.) When asked what constitutional rights Hester advised Petitioner of, Hester read the form (verbatim):

I reads [sic] it in third party, as if I'm in [sic] him, and I read it to him just as it states.

I have the absolute right to remain silent and I do not have to answer any questions or give a statement and this fact cannot be used against me.

And I have him sign it.

Then I read number two. If I do answer questions or give a statement, anything I say can and will be used against me in a court of law.

And then I have him initial it.

And then I go to number three. I have a right to consult with a lawyer of my choice before I answer questions or give a statement or have him present while being questioned.

And he signed it L.B.

If I wish to talk to a lawyer and have him present but am unable to afford to hire a lawyer, one will be appointed to represent me free of charge.

He signed it, L.B.; number four.

Number five. If I decide to answer questions or give a statement without having a lawyer present representing me, I have the absolute right during this interview to stop answering questions and to remain silent.

Underneath that it says, I fully understand these rights as explained to me. He signed it Byron Slater.

(R. at 78-79.) Hester further testified as follows:

Q. Now, below that there's another paragraph. Can you tell the Court what that paragraph says?

A. After reading him his rights I asked him, having your rights in mind, do you wish to waive your rights and answer questions concerning the charge of murder and armed robbery?

Understanding there's been no threats, force or promises of any kind have been made to you to cause you to waive these rights or to answer questions.

He indicated that he wished to talk to me, to be interviewed. I signed it. He signed it, same date and time.

Q. Same date and time.

At any point in time that you were talking to Mr. Slater, did he indicate to you that he wanted a lawyer present?

A. Not at any time.

Q. Did he indicate to you that he did not wish to answer any further questions and wanted to go back to his cell?

A. He was very cooperative, talked to us freely.

. . .

Q. At any point in time when he was in your custody or in your presence, were any promises, threats or coercion of any kind made to induce him to give you any kind of statement at all, sir?

A. No, it was not.

Q. At any point in time when he was in your custody or your presence, did he request the assistance of counsel before he answered any questions or indicated that he no longer wanted to answer your questions.

A. He never did that.

(R. at 79-80, 82.)

After hearing the testimony presented during the *Jackson v. Denno* hearing, the trial judge ruled that Petitioner was advised of his rights in compliance with *Miranda v. Arizona* and that Petitioner "understood and knowingly waived such rights." (R. at 95-96.) After Detective Widmer's direct examination testimony during the trial, the trial judge instructed the jury concerning consideration of the statements Petitioner made to Detective Widmer. (R. at 327-32.) The judge instructed the jury as follows:

> Ladies and gentlemen of the jury. There has been admitted into the record of this case an alleged statement said to have been made by the defendant.
>
> Before you consider this statement as evidence for any purpose, you must determine four questions.
>
> First, did the defendant make the statement. Secondly, was the defendant warned of his constitutional rights. Thirdly, did the defendant knowingly and intelligently waive his constitutional rights. And fourth, was the statement given voluntarily.
>
> . . .
>
> The State must prove beyond a reasonable doubt each of the four requirements that I have just stated to you before you may consider the statement as evidence for any purpose whatsoever. . . .

(R. at 327-28.) The judge gave a similar instruction during Sergeant Hester's testimony. (*See* R. at 347-48.)

Respondent is entitled to summary judgment as to Ground Two because the state court's adjudication of this claim is not contrary to, or an unreasonable application of, clearly established federal law; nor did the adjudication result in an unreasonable determination of the facts. As stated in *Miranda v. Arizona*, 384 U.S. 436 (1966), in the context of custodial interrogation, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. The undersigned sees nothing in the *Miranda* decision to indicate that the *Miranda* warning must also include the right to "let [the] defendant know he could end the interrogation." *See generally Miranda*, 384 U.S. 436; *see also Michigan v. Mosley*, 423 U.S. 96, 99-100 & n.6 (1975) (noting the "specified warnings" required by *Miranda* are as follows: "The warnings must inform the person in custody 'that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" (quoting *Miranda*, 384 U.S. at 444)); *United States v. Ricks*, 989 F.2d 501 (6th Cir. 1993) (unpublished table decision) (rejecting the argument that a *Miranda* warning must "include the right to stop answering questions at any time"); *United States v. Lares-Valdez*, 939 F.2d 688, 689-90 (9th Cir. 1991) ("We agree with the other federal courts that have ruled that a defendant need not be informed of a right to stop

questioning after it has begun. The only warnings *Miranda* requires were those given to Lares-Valdez in this case, namely, that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to consult an attorney before being asked any questions, that the attorney could be present during questioning and that if he could not afford a lawyer, one would be appointed for him if he wished." (citations omitted)); *United States v. DiGiacomo*, 579 F.2d 1211, 1214 (10th Cir. 1978) (noting that *Miranda* does not contain an "express requirement to warn suspects of the right to terminate questioning"). Given that *Miranda* does not require the warning Petitioner suggests, counsel's failure to object does not warrant habeas relief. *See Werts v. Vaughn*, 228 F.3d 178, 203 (3d Cir. 2000) ("counsel cannot be ineffective for failing to raise a meritless claim").

**C.**    **Ground Three**

Petitioner raises several grounds for relief within Ground Three. (*See* Dkt. No. 1 at 9 of 15.) As set forth above, Petitioner raises the following claims in Ground Three (verbatim):

> **GROUND THREE**: 1) Newly discovered evidence - Brady violation. 2) Subject matter jurisdiction. 3) Failure to investigate. 4) Newly after discovered evidence. 5) Police Misconduct. 6) Conflict of interest.
>
> **Supporting facts**: 1) Victim tested positive for cannabinoids cross re-actives  bag of marijuana was found on scene victim had a breathing ailment, gunshot wounds weren't fatal. 2) NCPD didn't have probable cause to arrest defendant due to a prior stop and release[.] 3) Marijuana found in victims [sic] system tied victim to bag of marijuana found in parking lot. Autopsy report was evidence that victim had 2 different sized entry wounds one big, one small, also yellow metal jacket projectile retrieve from body contradicts ballistics report done by SLED that projectile in body was nickel plated. 4) Victim was shot with 2 different caliber guns. 5) NCPD switch out and planted projectiles. 6) Trial counsel was baseball coach of victim and close friends with victim's mother.

(Dkt. No. 1 at 9 of 15.) Respondent contends all of these grounds are procedurally defaulted. (Dkt. No. 12 at 45 of 49.) The undersigned agrees; none of these claims were ever raised in state court. Accordingly, the undersigned recommends granting summary judgment to Respondent as to the claims set forth in Ground Three. The undersigned further notes the claims are meritless.

As to Petitioner's assertion of a *Brady* violation, in that the victim "tested positive for cannabinoids cross re-actives  bag of marijuana was found on scene victim had a breathing ailment,

gunshot wounds weren't fatal," it appears that Petitioner points to another portion of Ms. Collins'

autopsy report. (*See* Dkt. No. 21-1 at 16 of 34.) That portion of her report states,

> Toxicologic analysis was limited to liver due to the unavailability of admission blood. The deceased also received blood products intraoperatively. A general drug screen performed on liver was positive for cannabinoids cross-reactives. A liver analysis for ethanol was negative. Results are reviewed by Ken Habben, Forensic Toxicologist.

(Dkt. No. 21-1 at 16 of 34.)

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment . . . ." *Brady*, 373 U.S. at 87. To show a *Brady* violation, the Petitioner must show: (1) the evidence was favorable to the accused; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) prejudice ensued. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). In the instant case, *Brady* does not appear to be implicated, given that a *Brady* claim requires that the evidence be suppressed by the State. From a review of the record, it appears that counsel had Ms. Collins' autopsy report during trial. (*See* R. at 298-99.) Petitioner's claim of a *Brady* violation is without merit, as Ms. Collins' autopsy report was not suppressed by the State.

As to Petitioner's claim concerning the lack of subject matter jurisdiction, any allegation that the trial court lacked subject matter jurisdiction is not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *see also Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998) (holding jurisdiction is a matter of state law); *Von Longmore v. South Carolina*, No. C.A. 9:05-CV-2112-MBS, 2006 WL 2827416, at *6 (D.S.C. Sept. 27, 2006) ("Petitioner is not entitled to federal habeas relief because the subject matter jurisdiction of a state trial court is a state law issue.").

As to Petitioner's claim of "failure to investigate," "newly after discovered evidence," and "police misconduct," the substance of these claims is that (a) the "[a]utopsy report was evidence that the victim had 2 different sized entry wounds"–"one big[ and] one small"; (b) the "small also yellow metal jacket projectile retrieve[d] from [the victim's] body contradicts" the ballistics report "done

27

by SLED that [the] projectile in the body was nickel plated"; (c) the "victim was shot with 2 different caliber guns"; and (d) the North Charleston Police Department "switch[ed] out and planted projectiles." (Dkt. No. 1 at 9 of 15.) Many of the allegations of this claim have been addressed above, in addressing Petitioner's claim of actual innocence. These claims are, as noted by Respondent, procedurally defaulted, and for the reasons set forth above, Petitioner's claim of actual innocence is insufficient to lift the procedural bar. The undersigned further notes counsel's testimony–which was deemed credible by the PCR court–that he hired an expert to confirm the results of the ballistics test and that it "was clear that the weapon taken from [Petitioner's] house was the weapon that discharged the projectile that struck the victim." (R. at 782; *see also* R. at 819.)

As to Petitioner's claim of "conflict of interest," in that "trial counsel was [the] baseball coach of [the] victim and close friends with [the] victim's mother," (Dkt. No. 1 at 9 of 15), that claim is also procedurally defaulted. It is also without merit. The Sixth Amendment to the United States Constitution "guarantees criminal defendants the right to effective assistance of counsel, including the right to representation free from conflicts of interest." *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir. 1998). Counsel is constitutionally ineffective if: (1) counsel's performance was deficient, or fell below an objective standard of reasonableness; and (2) this deficient performance prejudiced the client's case so that the criminal defendant was deprived of a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To establish the first prong, a petitioner asserting a conflict of interest claim must demonstrate (1) that an actual conflict existed and (2) that it adversely affected counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). If these two prongs are met, the petitioner need not demonstrate prejudice. *United States v. Magini*, 973 F.2d 261, 263 (4th Cir. 1992).

Here, there is no evidence of a conflict of interest other than Petitioner's assertion that one existed.[9] Furthermore, Petitioner has not even asserted how this alleged conflict of interest affected

---

[9]Petitioner appears to rely on counsel's statement that he read the victim's obituary as evidence of a relationship with the victim. (*See* Dkt. No. 21 at 6 of 10; *see also* Dkt. No. 21-1 at 2-3 of 34, R. at 568-69.) Petitioner states (verbatim), "[T]he obituary wasn't apart [sic] of petitioners [sic] trial either trial counsel attended victims funeral or he got victims obituary from some one of the victims family." (Dkt. No. 21 at 6 of 10.)

counsel's performance, much less adversely affected performance. Accordingly, the undersigned recommends granting Respondent's Motion for Summary Judgment as to the claims set forth in Ground Three.

**D.    Petitioner's Motions**

As noted above, Petitioner filed two motions: a "Dispositive Motion" (Dkt. No. 34) and a Motion for Summary Judgment (Dkt. No. 39). Petitioner's Motion for Summary Judgment has been considered in making a recommendation with respect to Respondent's Motion for Summary Judgment, and for the reasons set forth herein, the undersigned recommends granting Respondent's Motion for Summary Judgment (Dkt. No. 36). Accordingly, the undersigned recommends denying Petitioner's Motion for Summary Judgment (Dkt. No. 39).

As to Petitioner's "Dispositive Motion", Petitioner simply makes various arguments about why he is entitled to relief on Grounds One, Two, and Three of his habeas petition. (*See generally* Dkt. No. 34). As he is not entitled to habeas relief for the reasons set forth herein, the undersigned recommends denying Petitioner's "Dispositive Motion" (Dkt. No. 34).

## CONCLUSION

It is RECOMMENDED, for the foregoing reasons, that Respondent's Motion for Summary Judgment (Dkt. No. 36) be GRANTED; that Petitioner's "Dispositive Motion" (Dkt. No. 34) and Petitioner's Motion for Summary Judgment (Dkt. No. 39) be DENIED; and that the Petitioner's habeas petition be DISMISSED WITH PREJUDICE. It is further RECOMMENDED that a certificate of appealability be denied.[10]

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

December 13, 2016
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

---

[10]Title 28, Section 2253 provides in relevant part,

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

28 U.S.C. § 2253. A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the case *sub judice*, the legal standard for a certificate of appealability has not been met. The undersigned therefore recommends that a certificate of appealability be denied.

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).